1
2
3
4
5
6
7
8
9

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| STUART SCHUPLER, Individually And On Behalf Of All Similarly Situated Individuals, | Case No.: 2:21-cv-1161 |
| Plaintiffs, | |
| v. | **CLASS ACTION COMPLAINT** |
| T-MOBILE USA, INC., | |
| Defendants. | **JURY TRIAL DEMANDED** |

Plaintiff Stuart Schupler ("Plaintiff"), individually and on behalf of class of similarly situated individuals (defined below), brings this action against Defendant T-Mobile USA, Inc. ("T-Mobile" or "Defendant"). Plaintiff makes the following allegations based upon personal knowledge as to their own actions and upon information and belief as to all other matters and believe that reasonable discovery will provide additional evidentiary support for the allegations herein.

### NATURE OF THE CASE

1.    This class action arises from the recent cyberattack and data breach against Defendant T-Mobile (the "2021 Data Breach"), a national telecommunications company that provides wireless communications services to customers throughout the United States and including Puerto Rico and the U.S. Virgin Islands. The 2021 Data Breach resulted in unauthorized access and exfiltration of highly sensitive information, including names, drivers' licenses,

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

government identification numbers, Social Security numbers, dates of birth, T-Mobile prepaid PINs, addresses, and phone number(s)[1] ("Personally Identifiable Information" or "PII").

2.    On August 15, 2021, *Vice.com* published an article entitled, "T-Mobile Investigating Claims of Massive Customer Data Breach" which stated that T-Mobile was investigating a forum post claiming to selling "a mountain" of personal data.

3.    On August 16, 2021, *krebsonsecurity.com* published an article entitled "T-Mobile Investigating Claims of Massive Data Breach."[2]    That article discussed, among other things, the discovery of the 2021 Data Breach, and stated:

> The intrusion came to light on Twitter when the account @und0xxed started tweeting the details. Reached via direct message, Und0xxed said they were not involved in stealing the databases but was instead in charge of finding buyers for the stolen T-Mobile customer data.
>
> Und0xxed said the hackers found an opening in T-Mobile's wireless data network that allowed access to two of T-Mobile's customer data centers.  From there, the intruders were able to dump a number of customer databases totaling more than 100 gigabytes.
>
> They claim one of those databases holds the name, date of birth, SSN, drivers license information, plaintext security PIN, address and phone number of 36 million T-Mobile customers in the United States — all going back to the mid-1990s.
> The hacker(s) claim the purloined data also includes IMSI and IMEI data for 36 million customers. These are unique numbers embedded in customer mobile devices that identify the device and the SIM card that ties that customer's device to a telephone number.

4.    On August 16, 2021, T-Mobile announced the 2021 Data Breach stating: "We have been working around the clock to investigate claims being made that T-Mobile data may have been illegally accessed."

5.    On August 17, 2021, T-Mobile confirmed the 2021 Data Breach stating: "Yesterday, we were able to verify that a subset of T-Mobile data had been accessed by

---

[1]    *See* https://www.t-mobile.com/brand/data-breach-2021
[2]    https://krebsonsecurity.com/2021/08/t-mobile-investigating-claims-of-massive-data-breach/

CLASS ACTION COMPLAINT - 2

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

1  unauthorized individuals" and "[w]e then located and immediately closed the access point that we

2  believe was used to illegally gain entry to our servers."

3      6.      As of August 20, 2021, and as a result of the 2021 Data Breach, Plaintiff and

4  approximately 50 million other people have been affected[3].  On August 20, 2021, T-Mobile

5  described the people affected by the 2021 Data Breach as[4]:

6  ▪ We previously reported information from approximately 7.8 million current
   T-Mobile postpaid customer accounts that included first and last names,
7    date of birth, SSN, and driver's license/ID information was compromised.
   We have now also determined that phone numbers, as well as IMEI and
8    IMSI information, the typical identifier numbers associated with a mobile
   phone, were also compromised.  Additionally, we have since identified
9    another 5.3 million current postpaid customer accounts that had one or more
   associated customer names, addresses, date of births, phone numbers,
10   IMEIs and IMSIs illegally accessed. These additional accounts did not have
   any SSNs or driver's license/ID information compromised.
11

12 ▪ We also previously reported that data files with information from about 40
   million former or prospective T-Mobile customers, including first and last
13   names, date of birth, SSN, and driver's license/ID information, were
   compromised. We have since identified an additional 667,000 accounts of
14   former T-Mobile customers that were accessed with customer names, phone
   numbers, addresses and dates of birth compromised. These additional
15   accounts did not have any SSNs or driver's license/ID information
   compromised.
16

17 ▪ Separately, we have also identified further stolen data files including phone
   numbers, IMEI, and IMSI numbers. That data included no personally
18   identifiable information.
19

20 ▪ We continue to have no indication that the data contained in any of the
   stolen files included any customer financial information, credit card
21   information, debit or other payment information.
22

23

24

25 3     See https://www.cnet.com/tech/services-and-software/t-mobile-data-breach-more-than-50-
   million-people-now-affected/.
26 4     See https://www.t-mobile.com/news/network/additional-information-regarding-2021-cyberattack-
   investigation.

CLASS ACTION COMPLAINT - 3

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

▪ As we previously reported, approximately 850,000 active T-Mobile prepaid customer names, phone numbers and account PINs were exposed. We have proactively reset ALL of the PINs on these accounts. Similar information from additional inactive prepaid accounts was also accessed. In addition, up to 52,000 names related to current Metro by T-Mobile accounts may have been included. None of these data sets included any personally identifiable information. Further, none of the T-Mobile files stolen related to former Sprint prepaid or Boost customers.

7.      As more fully discussed herein, T-Mobile has suffered many data breaches in the past, and as a result knew its systems were vulnerable to attack.  Yet it failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect its customers' personal information.  These failures put millions of customers at great risk of scams and identity theft.

8.      As a result of T-Mobile's wrongful conduct, Plaintiff and members of the proposed classes have been damaged in an amount not yet ascertained.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this action under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5,000,000, exclusive of interests and costs, there are more than 100 class members, and one or more members of the classes are residents of a different state than the Defendant.  The Court also has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

10.     This Court has personal jurisdiction over Defendant because it is headquartered in this District.

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), as Defendant resides, transacts business, committed an illegal or tortious act, has an agent, and/or can be found in this District.

## PARTIES

12.     Plaintiff Stuart Schupler ("Plaintiff") is a resident of Atlantic County, New Jersey and provided his personal information to T-Mobile in order to receive wireless communication

CLASS ACTION COMPLAINT - 4

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

services from T-Mobile prior to the 2021 Data Breach. Plaintiff has been a T-Mobile customer since at least approximately 2016.

13.    On or about August 20, 2021, Plaintiff received a text message from T-Mobile notifying him that his PII was accessed without authorization, exfiltrated, and/or stolen in the Data Breach. Plaintiff spent time and effort monitoring his financial accounts to detect fraudulent activity. Given the highly sensitive nature of the information stolen, Plaintiff remains at substantial harm of imminent risk.

14.    Defendant T-Mobile is a Delaware corporation headquartered in this district, at 12920 SE 38th Street, Bellevue, WA 98006. Defendant is a publicly traded company organized and operated for the profit and financial benefit of its shareholders. In 2020, Defendant had annual gross revenues in excess of $65 billion. Defendant collects and maintains the personal information of millions of U.S. and New Jersey consumers.

15.    Defendant's unlawful conduct was authorized, ordered, or performed by its directors, officers, managers, agents, employees, or representatives in the course of their employment and while actively engaged in the management of Defendant's affairs. Defendant, through its subsidiaries, divisions, affiliates and agents, operated as a single unified entity with each acting as the alter ego, agent or joint venturer of or for the other with respect to the acts, violations, and common course of conduct alleged herein and under the authority and apparent authority of parent entities, principals and controlling parties.

## FACTS

### T-Mobile and Its Privacy Policy

16.    T-Mobile is a publicly traded company that as of December 31, 2020, provided wireless services to 102.1 million postpaid and prepaid customers. As described in T-Mobile's annual report for the fiscal year ended December 31, 2020, and filed with the Securities and Exchange Commission ("SEC") on February 23, 2021 (the "2020 Form 10-K"), postpaid and prepaid customers are described as:

- Postpaid customers generally include customers who are qualified to pay after receiving wireless communications services utilizing phones, wearables, DIGITS (a service that allows our customers to

CLASS ACTION COMPLAINT - 5

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

use multiple mobile numbers on any compatible smartphone or device with internet connection) or other connected devices, which include tablets and SyncUp products; and

- Prepaid customers generally include customers who pay for wireless communications services in advance. Our prepaid customers include customers of T-Mobile and Metro by T-Mobile.

17.    The 2020 Form 10-K identifies T-Mobile's sources of revenue as follows:

We generate the majority of our service revenues by providing wireless communications services to postpaid and prepaid customers.  Our ability to attract and retain postpaid and prepaid customers is important to our business in the generation of service revenues, equipment revenues and other revenues.  In 2020, our service revenues generated by providing wireless communications services by customer category were:

- 72% Postpaid customers;
- 19% Prepaid customers; and
- 9% Wholesale, roaming and other services

**Data Collected By T-Mobile**

18.    On its website, T-Mobile identifies the data it collects from its customers[5], including Plaintiff and the proposed classes:

What Data We Collect

Personal Data You Provide Directly to Us

- Contact and account information, like your name, usernames, passwords, address, telephone number, email address, and household members.
- Authentication and security information like your government identification, Social Security number, security codes, and signature.
- Demographic information, like your age, gender, veteran status, and date of birth;
- Payment information, like your credit card, debit card, and bank account number (see the T-Mobile Financial Privacy Notice and Sprint Financial Privacy Notice for more information);

---

[5]    *See* https://www.t-mobile.com/privacy-center/our-practices/privacy-policy.

CLASS ACTION COMPLAINT - 6

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

- Preference information, including preferences related to marketing, advertising and communications and participation in T-Mobile programs; and
- Other information you choose to provide, like when you submit a survey response, enter a contest or promotion, or contact us.

Personal Data We Collect Automatically

- Customer Proprietary Network Information ("CPNI") generated by your use of our wireless voice communications services. See the CPNI article for more information;
- Unique identifiers like cookie IDs, device IDs including mobile advertising IDs, IP address, and media access control ("MAC") address collected though tracking technologies like web beacons, pixels, and other tracking technologies. See our article on Cookies and Tracking Technology.
- Information from your use of our products, services, and network (and other carriers' networks when roaming domestically or internationally) like your usage of connecting carriers and Internet service providers, the Internet Protocol ("IP") address, text messages, and data use history, websites and URLs visited, content interactions (e.g., how long you use an app), viewing info from our streaming services (e.g., videos you watch on TVision), mobile apps installed or used or that interact with your device, language settings, and other network and device analytics and Wi-Fi connection and usage data;
- Device and service performance and diagnostic information, including reports from your device about signal strength, speeds, app and service performance, dropped calls, call and data failures, geolocation information, and device data like battery strength and serial number and similar device identifiers, settings, language preferences, and software versions, including your browser type and operating system version, the website that referred you to one of our websites, or that you visit upon leaving our websites.
- Back-up information, including data stored in back-ups and cloud services if your device uploads information to T-Mobile network servers (e.g., some devices may back-up your address book, photo album, or diagnostic data);
- Commercial information, including records of your purchases from us and purchase tendencies;
- Geolocation data, specifically data that identifies the approximate or precise location of your mobile device. We may also use location technologies to collect data about the presence of your device;

CLASS ACTION COMPLAINT - 7

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

- Biometric data, including biometric signatures for authentication and fraud prevention. For more information, see the Biometric Information Notice.
- Video data, including images from video monitoring and recordings of people in our retail stores;
- Audio information, including voice commands you provide to our apps (for example, for accessibility or hands-free use), and audio recordings of calls between you and our customer service representatives.

Personal Data We Collect from Other Sources

We may collect personal data about you from other sources. For example, we may obtain updated address information from our shippers like the United States Postal Service, and we may collect information from financial institutions and credit agencies. We may also buy or get personal data from other third parties, like social media platforms, analytics providers, and consumer data resellers. This information could include contact information, demographic information, geolocation information, and information about your interests, preferences, or behaviors. We use this data for things like product and service improvement, marketing, and advertising. For more information see the What Data We Collect section.

Personal Data We Infer

We may learn about your preferences or characteristics based on other personal data we collect. For example, we may infer that you are looking to purchase a new device based on your browsing activity while using our services, and we may use your IP address to estimate your general location We may also use this information for advertising purposes.

**T-Mobile's Disclosures Regarding How It Protects This Data and Associated Risk**

19.    Regarding protecting customer data, T-Mobile states on its website[6]:

How We Protect Your Data

We use administrative, technical, contractual, and physical safeguards designed to protect your data while it is under our control.  For example, when you contact us by phone or visit us in our stores, we have procedures in place to make sure that only the primary account holder or authorized users have access.

---

6      *Id.*

CLASS ACTION COMPLAINT - 8

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

20.    Regarding risks related to security breaches, in its 2020 Form 10-K T-Mobile states:

We could be harmed by data loss or other security breaches, whether directly or indirectly.

Our business involves the receipt, storage and transmission of our customers' confidential information, including sensitive personal information and payment card information, confidential information about our employees and suppliers, and other sensitive information about our Company, such as our business plans, transactions and intellectual property (collectively, "Confidential Information"). Unauthorized access to Confidential Information may be difficult to anticipate, detect, or prevent, particularly given that the methods of unauthorized access constantly change and evolve. We are subject to the threat of unauthorized access or disclosure of Confidential Information by state-sponsored parties, malicious actors, third parties or employees, errors or breaches by third-party suppliers, or other security incidents that could compromise the confidentiality and integrity of Confidential Information.

We have previously notified affected customers of incidents involving unauthorized access to certain customer information in compliance with applicable laws concerning customer notice, and we expect we will provide such notices again. For example, in December 2020, we notified a small number of customers of unauthorized access to their account information that is considered "customer proprietary network information" by the FCC. More typically, such incidents involved attempts to commit fraud by taking control of a customer's phone line. In a few cases, incidents involved unauthorized access to credit card information, financial data, social security numbers or passwords. While we do not believe these security incidents were material and actions were taken to prevent reoccurrence, we expect to continue to be the target of cyber-attacks, data breaches, or security incidents, which may in the future have a material adverse effect on our business, reputation, financial condition, and operating results.

As a telecommunications carrier, we are considered a critical infrastructure provider and therefore may be more likely to be the target of cyber-attacks (e.g., denial of service and other malicious attacks). Such attacks against companies may be perpetrated by a variety of groups or persons, including those in jurisdictions where law enforcement measures to address such attacks are ineffective or unavailable, and such attacks may even be perpetrated by or at the behest of foreign governments.

In addition, we provide confidential, proprietary and personal information to third-party service providers as part of our business operations. These third-party service providers have experienced data breaches and other attacks that included unauthorized access to Confidential Information in the past, and face security challenges common to all parties that collect and process information. Past data breaches include a breach of the networks of one of our credit decisioning providers

CLASS ACTION COMPLAINT - 9

in September 2015, during which a subset of records containing current and potential customer information was acquired by an external party.

Our procedures and safeguards to prevent unauthorized access to sensitive data and to defend against attacks seeking to disrupt our services must be continually evaluated and revised to address the ever-evolving threat landscape. We cannot make assurances that all preventive actions taken will adequately repel a significant attack or prevent information security breaches or the misuses of data, unauthorized access by third parties or employees, or exploits against third-party supplier environments. If we or our third-party suppliers are subject to such attacks or security breaches, we may incur significant costs or other material financial impacts, which may not be covered by, or may exceed the coverage limits of, our cyber insurance, be subject to regulatory investigations, sanctions and private litigation, experience disruptions to our operations or suffer damage to our reputation. Any future cyber-attacks, data breaches, or security incidents may have a material adverse effect on our business, financial condition and operating results.

**The Data Breach**

21.    As described above, T-Mobile admitted it was the subject of a yet another massive data breach that affected approximately half/millions of its customers.  T-Mobile did not discover this data breach through its own tools and oversight, but instead through forum postings.

22.    The customer PII the hackers have sold and continue to market for sale is believed to include: customers' names, addresses, social security numbers, drivers' license information, phone numbers, dates of birth, security PINs, phone numbers, and, for some customers, unique IMSI and IMEI numbers (embedded in customer mobile devices that identify the device and the SIM card that ties that customer's device to a telephone number), going back as far as the mid-1990s.

23.    According to the hackers, they were able to access the PII through an opening in T-Mobile's wireless data network that allowed access to two of T-Mobile's customer data centers. From there, they were able to access several customer databases totaling more than 100 gigabytes.

24.    Motherboard, the tech news division of Vice, has reported that it reviewed samples of the data and confirmed it contained accurate information about T-Mobile customers.  The hackers also offered to verify that they possessed the customers' PII stating: "If you want to verify that I have access to the data/the data is real, just give me a T-Mobile number and I'll run a lookup for you and return the IMEI and IMSI of the phone currently attached to the number and any other

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

details," @und0xxed said. "All T-Mobile USA prepaid and postpaid customers are affected; Sprint and the other telecoms that T-Mobile owns are unaffected."

25.    As a result of the 2021 Data Breach and because the stolen data is being actively marketed for sale, numerous entities are suggesting that affected consumers take steps to protect their identities.

26.    *The Washington Post* reported that affected individuals should: (i) Change your password and PIN; (ii) freeze your credit; (iii) rethink two-factor authentication; and (iv) keep monitoring the situation[7].

**T-Mobile Knew It Was the Target of Cyber Threats And Still Failed To Secure Its Sensitive Data - T-Mobile's History of Data Breaches**

27.    T-Mobile has extensive experience with data breaches. *The Washington Post* reported that "[u]nfortunately, dealing with data breaches is nothing new for the company — or its customers. For those keeping count, this is the fifth [not including the 2015 Experian data breach] such incident the wireless carrier has suffered in the past three years, but according to Allie Mellen, a security and risk analyst at Forrester Research, this is 'the worst breach they've had so far.'"[8]

28.    In 2015, T-Mobile customers' PII was accessed and exfiltrated in conjunction with the Experian data breach. According to T-Mobile at the time, the company was notified by Experian, a vendor that processes their credit applications, that they had experienced a data breach. The hacker acquired the records of approximately 15 million people, including new applicants requiring a credit check for service or device financing. The records stolen included information such as name, address and birthdate as well as encrypted fields with Social Security number and ID number (such as driver's license or passport number), and additional information used in T-

---

[7]    Velazco, Chris, Here's what to do if you think you're affected by T-Mobile's big data breach, *Washington Post*, August 19, 2021, available at
https://www.washingtonpost.com/technology/2021/08/19/t-mobile-data-breach-what-to-do/
[8]    *Id.*

CLASS ACTION COMPLAINT - 11

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

Mobile's own credit assessment. Experian determined that encryption may have been compromised.[9]

29.    In 2017, Karan Saini, a security researcher, found a bug on a T-Mobile website that allowed hackers to access PII like email addresses, account numbers, and IMSI numbers, just by knowing or guessing a customer's phone number.[10]  According to Saini "T-Mobile has 76 million customers, and an attacker could have ran a script to scrape the data (email, name, billing account number, IMSI number, other numbers under the same account which are  usually family members) from all 76 million of these customers to create a searchable database with accurate and up-to-date information of all users."[11]  Saini explained "[t]hat would effectively be classified as a very critical data breach, making every T-Mobile cell phone owner a victim."[12]  T-Mobile had no mechanism in place to prevent this type of critical data breach, according to Saini.[13]  According to a hacker, the bug had been exploited by multiple hackers over a multi-week period before it was discovered by Saini.[14]  In fact, the hackers who found the bug before Saini went so far as to upload a tutorial on how to exploit it on YouTube.[15]

30.    In 2018, hackers gained access to T-Mobile servers and stole PII of roughly two million T-Mobile customers.[16] The stolen PII included names, email addresses, account numbers, other billing information, and encrypted passwords.[17] T-Mobile misleadingly downplayed the hack, claiming that no passwords were "compromised."[18] In truth, the hackers stole millions of

---

[9]    A Letter from CEO John Legere on Experian Data Breach, Sept. 30, 2015, available at https://www.tmobile.com/news/blog/experian-data-breach
[10]    Franceschi-Bicchierai, Lorenzo, T-Mobile Website Allowed Hackers to Access Your Account Data With Just Your Phone Number, Motherboard Tech, Oct. 10, 2017, available at https://www.vice.com/en/article/wjx3e4/t-mobile-website-allowed-hackers-to-access-your-account-data-with-just-your-phone-number.
[11]    *Id.*
[12]    *Id.*
[13]    *Id.*
[14]    *Id.*
[15]    *Id.*
[16]    Franceschi-Bicchierai, Lorenzo, Hackers Stole Personal Data of 2 Million T-Mobile Customers, Motherboard Tech, Aug, 23, 2018, available at https://www.vice.com/en/article/a3qpk5/t-mobile-hack-data-breach-api-customer-data.
[17]    *Id.*
[18]    *Id.*

CLASS ACTION COMPLAINT - 12

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

encrypted passwords that were likely cracked due to the weak encoding algorithm employed by T-Mobile, leading one security expert to advise affected customers to assume their passwords were cracked and change them as a result.[19]

31.     In November 2019, hackers accessed PII for roughly 1 million T-Mobile prepaid customers.[20] The PII in that breach included names, phone numbers, addresses, account information, and rate, plan and calling features (i.e., paying for international calls).[21]

32.     In March 2020, T-Mobile disclosed it was subject to a data breach that exposed customer and employee PII, including names, addresses, social security numbers, financial account information, government identification numbers, phone numbers and billing account information.[22] Later in 2020, T-Mobile suffered another data breach in which hackers accessed customer proprietary network information (CPNI) and undisclosed call-related information for hundreds of thousands of customers.[23]

33.     In addition to the data breaches suffered by T-Mobile, there have been other notable cyber-attacks (*e.g.*, Marriott) which put T-Mobile on notice of its need to protect its customers against such events.

---

[19]    *Id.*
[20]    Coldeway, Devin, More than 1 million T-Mobile customers exposed by breach, TechCrunch, Nov. 22, 2019, available at https://techcrunch.com/2019/11/22/more-than-1- million-t-mobile-customers-exposed-by-breach/#:~:text=More%20than%201%20million%20TMobile%20customers%20exposed%20by,password%20data29%20was%20exposed%20to%2 0a%20malicious%20actor.
[21]    *Id.*
[22]    T-Mobile Breach Leads To The Exposure Of Employee Email Accounts And User Data, Identity Theft Resource Center, Mar. 2020, available at https://www.idtheftcenter.org/t-mobile-breach-leads-to-the-exposure-of-employee-email-accounts-and-user-data/#:~:text=On%20Thursday%2C%20March%204%2C%202020%2C%20T-Mobile%20disclosed%20aseparate%20data%20breach%20notification%20letters%20on%20their%20website.
[23]    Second Data Breach in 2020 for T-Mobile Exposed Customer and Call-Related Information of 200,000 Subscribers, CPO Magazine, Jan. 11, 2021, available at https://www.cpomagazine.com/cyber-security/second-data-breach-in-2020-for-t-mobile-exposed-customer-and-call-related-information-of-200000subscribers/#:~:text=TMobile%20suffered%20a%20data%20breach%20in%20which%20hackers,the%20fourth%20to%20hit%20the%20company%20since%202018 .

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

**The 2021 Data Breach And Its Impact On Plaintiff Stuart Schupler**

34.    Plaintiff has been a customer of T-Mobile from approximately 2016 through the present, and is a resident of Egg Harbor City, New Jersey.

35.    On approximately August 20, 2021, Plaintiff became aware that that T- Mobile had suffered a massive data breach and customer PII was being sold by hackers.  Plaintiff received a text message from T-Mobile which stated:

> T-Mobile has determined that unauthorized access to some of your information, or others on your account, has occurred, like name, address, phone number and DOB. Importantly, we have NO information that indicates your SSN, personal financial or payment information, credit/debit card information, account numbers, or account passwords were accessed. We take the protection of our customers seriously. Learn more about practices that keep your account secure and general recommendations for protecting yourself: t-mo.co/Protect.

36.    On that same date, Plaintiff received multiple spam calls pressuring him to take certain action.

37.    Because of the T-Mobile notification and spam calls, Plaintiff has spent hours addressing the resulting privacy concerns, including researching the nature of the breach, and reviewing his financial and credit account statements for evidence of unauthorized activity, which she will continue to do for years into the future.

### Data Security Rules And Regulations
### FTC Security Guidelines Concerning PII

38.    The Federal Trade Commission ("FTC") has established security guidelines and recommendations to help entities protect PII and reduce the likelihood of data breaches.

39.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, failing to use reasonable measures to protect PII by companies like Defendant.  Several publications by the FTC outline the importance of implementing reasonable security systems to protect data. The FTC has made clear that protecting sensitive customer data should factor into virtually all business decisions.

40.    In 2016, the FTC provided updated security guidelines in a publication titled Protecting Personal Information: A Guide for Business.  Under these guidelines, companies should protect consumer information they keep; limit the sensitive consumer information they keep;

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

encrypt sensitive information sent to third parties or stored on computer networks; identify and understand network vulnerabilities; regularly run up-to-date anti-malware programs; and pay particular attention to the security of web applications – the software used to inform visitors to a company's website and to retrieve information from the visitors.

41.      The FTC recommends that businesses do not maintain payment card information beyond the time needed to process a transaction; restrict employee access to sensitive customer information; require strong passwords be used by employees with access to sensitive customer information; apply security measures that have proven successful in the particular industry; and verify that third parties with access to sensitive information use reasonable security measures.

42.      The FTC also recommends that companies use an intrusion detection system to immediately expose a data breach; monitor incoming traffic for suspicious activity that indicates a hacker is trying to penetrate the system; monitor for the transmission of large amounts of data from the system; and develop a plan to respond effectively to a data breach in the event one occurs.

43.      The FTC has brought several actions to enforce Section 5 of the FTC Act. According to its website:

> When companies tell consumers they will safeguard their personal information, the FTC can and does take law enforcement action to make sure that companies live up these promises. The FTC has brought legal actions against organizations that have violated consumers' privacy rights or misled them by failing to maintain security for sensitive consumer information or caused substantial consumer injury. In many of these cases, the FTC has charged the defendants with violating Section 5 of the FTC Act, which bars unfair and deceptive acts and practices in or affecting commerce. In addition to the FTC Act, the agency also enforces other federal laws relating to consumers' privacy and security.

44.      T-Mobile was aware or should have been aware of its obligations to protect its customers' PII and privacy before and during the Data Breach yet failed to take reasonable steps

CLASS ACTION COMPLAINT - 15

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

to protect customers from unauthorized access. Among other violations, T-Mobile violated its obligations under Section 5 of the FTC Act.

### National Institute Of Standards And Technology ("NIST") And Its Cybersecurity Framework ("Framework")

45.     In the NIST's publication, Framework for Improving Critical Infrastructure Cybersecurity, Version 1.1 (April 16, 2018), the Executive Summary states in relevant part:

> The United States depends on the reliable functioning of critical infrastructure. Cybersecurity threats exploit the increased complexity and connectivity of critical infrastructure systems, placing the Nation's security, economy, and public safety and health at risk. Similar to financial and reputational risks, cybersecurity risk affects a company's bottom line. It can drive up costs and affect revenue. It can harm an organization's ability to innovate and to gain and maintain customers. Cybersecurity can be an important and amplifying component of an organization's overall risk management.
>
> To better address these risks, the Cybersecurity Enhancement Act of 2014 (CEA) updated the role of the National Institute of Standards and Technology (NIST) to include identifying and developing cybersecurity risk frameworks for voluntary use by critical infrastructure owners and operators. Through CEA, NIST must identify "a prioritized, flexible, repeatable, performance-based, and cost-effective approach, including information security measures and controls that may be voluntarily adopted by owners and operators of critical infrastructure to help them identify, assess, and manage cyber risks."

46.     NIST organizes its approach into three components: (i) Framework Core; (ii) Framework Implementation Tiers; and (iii) Framework Profile.

47.     The Framework Core provides a set of activities to achieve specific cybersecurity outcomes, and it references examples of guidance to achieve those outcomes.  The Core is comprised of four elements: Functions, Categories, Subcategories, and Informative References. Functions organize basic cybersecurity activities at their highest level. These Functions are (i) Identify, (ii) Protect, (iii) Detect, (iv) Respond, and (v) Recover.

48.     The Framework Implementation Tiers ("Tiers") provide context on how an organization views cybersecurity risk and the processes in place to manage that risk. In the Framework, the Tiers are described: as Partial (Tier 1), Risk Informed (Tier 2), Repeatable (Tier

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

3), and Adaptive (Tier 4).  Each Tier describes an increasing degree of rigor and sophistication in cybersecurity risk management practices.

49.    NIST encourages organizations to manage its cybersecurity risk at Tier 2 ("Risk Informed") or greater.

50.    As stated in its publication, the Framework Profile "is the alignment of the Functions, Categories, and Subcategories with the business requirements, risk tolerance, and resources of the organization.  A Profile enables organizations to establish a roadmap for reducing cybersecurity risk that is well aligned with organizational and sector goals, considers legal/regulatory requirements and industry best practices, and reflects risk management priorities."

### SEC Guidance

51.    On February 26, 2018, the SEC issued its Statement and Guidance on Public Company Cybersecurity Disclosures (the "Statement").    This Statement provides that "[c]ompanies are required to establish and maintain appropriate and effective disclosure controls and procedures that enable them to make accurate and timely disclosures of material events, including those related to cybersecurity."

52.    The SEC requires that companies provide timely and ongoing information in its periodic reports regarding material cybersecurity risks and incidents that trigger disclosure obligations and encourages companies to continue to use Form 8-K or Form 6-K to disclose material information promptly, including disclosure pertaining to cybersecurity matters

53.    This Statement also provides:

Securities Act and Exchange Act registration statements must disclose all material facts required to be stated therein or necessary to make the statements therein not misleading. Companies should consider the adequacy of their cybersecurity-related disclosure, among other things, in the context of Sections 11, 12, and 17 of the Securities Act, as well as Section 10(b) and Rule 10b-5 of the Exchange Act.

* * *

In addition to the information expressly required by Commission regulation, a company is required to disclose "such further material information, if any, as may be necessary to make the required statements, in light of the circumstances under which they are made, not misleading." The

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

Commission considers omitted information to be material if there is a substantial likelihood that a reasonable investor would consider the information important in making an investment decision or that disclosure of the omitted information would have been viewed by the reasonable investor as having significantly altered the total mix of information available.

54.     In discussing "materiality", the Statement provides:

The materiality of cybersecurity risks or incidents depends upon their nature, extent, and potential magnitude, particularly as they relate to any compromised information or the business and scope of company operations.33 The materiality of cybersecurity risks and incidents also depends on the range of harm that such incidents could cause. This includes harm to a company's reputation, financial performance, and customer and vendor relationships, as well as the possibility of litigation or regulatory investigations or actions, including regulatory actions by state and federal governmental authorities and non-U.S. authorities.

\* \* \*

Understanding that some material facts may be not available at the time of the initial disclosure, we recognize that a company may require time to discern the implications of a cybersecurity incident . . . .  However, an ongoing internal or external investigation – which often can be lengthy – would not on its own provide a basis for avoiding disclosures of a material cybersecurity incident.

55.     Additionally, when a company experiences a data security incident, the Statement emphasizes the need to "refresh" previous disclosures during the process of investigating a cybersecurity incident or past events.

56.     Regarding the form of disclosures, the Statement provides:

We expect companies to provide disclosure that is tailored to their particular cybersecurity risks and incidents. As the Commission has previously stated, we "emphasize a company-by-company approach [to disclosure] that allows relevant and material information to be disseminated to investors without boilerplate language or static requirements while preserving completeness and comparability of information across companies." Companies should avoid generic cybersecurity-related disclosure and provide specific information that is useful to investors.

CLASS ACTION COMPLAINT - 18

57.     Regarding a company's risk disclosures in its public filings, the Statement provides:

In meeting their disclosure obligations, companies may need to disclose previous or ongoing cybersecurity incidents or other past events in order to place discussions of these risks in the appropriate context. For example, if a company previously experienced a material cybersecurity incident involving denial-of-service, it likely would not be sufficient for the company to disclose that there is a risk that a denial-of-service incident may occur. Instead, the company may need to discuss the occurrence of that cybersecurity incident and its consequences as part of a broader discussion of the types of potential cybersecurity incidents that pose particular risks to the company's business and operations. Past incidents involving suppliers, customers, competitors, and others may be relevant when crafting risk factor disclosure. In certain circumstances, this type of contextual disclosure may be necessary to effectively communicate cybersecurity risks to investors.

58.     Regarding the Board of Directors risk oversight, the Statement provides:

Item 407(h) of Regulation S-K and Item 7 of Schedule 14A require a company to disclose the extent of its board of directors' role in the risk oversight of the company, such as how the board administers its oversight function and the effect this has on the board's leadership structure.  The Commission has previously said that "disclosure about the board's involvement in the oversight of the risk management process should provide important information to investors about how a company perceives the role of its board and the relationship between the board and senior management in managing the material risks facing the company."  A company must include a description of how the board administers its risk oversight function. To the extent cybersecurity risks are material to a company's business, this discussion should include the nature of the board's role in overseeing the management of that risk.

59.     In addition, disclosures regarding a company's cybersecurity risk management program and how the board of directors engages with management on cybersecurity issues allow investors to assess how a board of directors is discharging its risk oversight responsibility in this increasingly important area.

60.     Regarding disclosure controls and procedures, the Statement provides in relevant part:

Companies should assess whether they have sufficient disclosure controls and procedures in place to ensure that relevant information about

CLASS ACTION COMPLAINT - 19

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

cybersecurity risks and incidents is processed and reported to the appropriate personnel, including up the corporate ladder, to enable senior management to make disclosure decisions and certifications and to facilitate policies and procedures designed to prohibit directors, officers, and other corporate insiders from trading on the basis of material nonpublic information about cybersecurity risks and incidents.

*    *    *

A company's disclosure controls and procedures should not be limited to disclosure specifically required but should also ensure timely collection and evaluation of information potentially subject to required disclosure, or relevant to an assessment of the need to disclose developments and risks that pertain to the company's businesses…. Controls and procedures should enable companies to identify cybersecurity risks and incidents, assess and analyze their impact on a company's business, evaluate the significance associated with such risks and incidents, provide for open communications between technical experts and disclosure advisors, and make timely disclosures regarding such risks and incidents.

61.    The Statement also cautions companies about insider trading, stating "it is important to have well designed policies and procedures to prevent trading on the basis of all types of material non-public information, including information relating to cybersecurity risks and incidents."

### The Data Breach Harmed Plaintiff And Class Members

62.    Plaintiff and Class members have suffered and will continue to suffer harm because of the 2021 Data Breach.

63.    Plaintiff and Class members face an imminent and substantial risk of injury of identity theft and related cyber-crimes due to the 2021 Data Breach. Once data is stolen, malicious actors will either exploit the data for profit themselves or sell the data on the dark web, as occurred here, to someone who intends to exploit the data for profit. Hackers would not incur the time and effort to steal PII and then risk prosecution by listing it for sale on the dark web if the PII was not valuable to malicious actors.

64.    The dark web helps ensure users' privacy by effectively hiding server or IP details from the public. Users need special software to access the dark web. Most websites on the dark

CLASS ACTION COMPLAINT - 20

web are not directly accessible via traditional searches on common search engines and are therefore accessible only by users who know the addresses for those websites.

65.    Malicious actors use PII to gain access to Class members' digital life, including bank accounts, social media, and credit card details.  During that process, hackers can harvest other sensitive data from the victim's accounts, including personal information of family, friends, and colleagues.

66.    Malicious actors can also use Class members' PII to open new financial accounts, open new utility accounts, obtain medical treatment using victims' health insurance, file fraudulent tax returns, obtain government benefits, obtain government IDs, or create "synthetic identities."

67.    The PII accessed in the 2021 Data Breach therefore has significant value to the hackers that have already sold or attempted to sell that information and may do so again. In fact, names, mailing and email addresses, dates of birth, phone numbers, account information, social security numbers, phone identification numbers, and drivers' license numbers are among the most valuable pieces of information for hackers.

68.    As established above, the PII accessed in the 2021 Data Breach is also very valuable to T-Mobile. T-Mobile collects, retains, and uses this information to increase profits through predictive and other targeted marketing campaigns.  T-Mobile customers value the privacy of this information and expect T-Mobile to allocate enough resources to ensure it is adequately protected. Customers would not have done business with T-Mobile, provided their PII and payment card information, and/or paid the same prices for T-Mobile's goods and services had they known T-Mobile did not implement reasonable security measures to protect their PII.  T-Mobile boasts that it is the second largest wireless carrier in the country. Customers expect that the payments they make to the carrier, either prepaid or each month, incorporate the costs to implement reasonable security measures to protect customers' personal information.

69.    The PII accessed in the 2021 Data Breach is also very valuable to Plaintiff and Class members. Consumers often exchange personal information for goods and services.  For example, consumers often exchange their personal information for access to WIFI in places like airports and coffee shops.  Likewise, consumers often trade their names and email addresses for

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

special discounts (*e.g.*, sign-up coupons exchanged for email addresses). Consumers use their unique and valuable PII to access the financial sector, including when obtaining a mortgage, credit card, or business loan. As a result of the 2021 Data Breach, Plaintiff and Class members' PII has been compromised and lost significant value.

70. Plaintiff and Class members will face a risk of injury due to the 2021 Data Breach for years to come. Malicious actors often wait months or years to use the personal information obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These bad actors will also re-use stolen personal information, meaning individuals can be the victim of several cybercrimes stemming from a single data breach.

71. There is often significant lag time between when a person suffers harm due to theft of their PII and when they discover the harm. For example, victims rarely know that certain accounts have been opened in their name until contacted by collections agencies. Plaintiff and Class members will therefore need to continuously monitor their accounts for years to ensure their PII obtained in the Data Breach is not used to harm them.

72. Even when reimbursed for money stolen due to a data breach, consumers are not made whole because the reimbursement fails to compensate for the significant time and money required to repair the impact of the fraud. On average, victims of identity theft spend 7 hours fixing issues caused by the identity theft. In some instances, victims spend more than 1,000 hours trying to fix these issues.

73. Victims of identity theft also experience harm beyond economic effects. According to a 2018 study by the Identity Theft Resource Center, 32% of identity theft 25 victims experienced negative effects at work (either with their boss or coworkers) and 8% experienced negative effects at school (either with school officials or other students).

74. The U.S. Government Accountability Office likewise determined that "stolen data may be held for up to a year or more before being used to commit identity theft," and that "once

CLASS ACTION COMPLAINT - 22

stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years."

75.    Plaintiff and Class Member customers have failed to receive the value of the T-Mobile services for which they paid and/or would have paid less had they known that T-Mobile was failing to use reasonable security measures to secure their data.

**Defendant Failed To Take Reasonable Steps To Protect Its Customers' PII**

76.    T-Mobile requires its customers to provide a significant amount of highly personal and confidential PII to purchase its good and services. Defendant collects, stores, and uses this data to maximize profits while failing to encrypt or protect it properly.

77.    T-Mobile has legal duties to protect its customers' PII by implementing reasonable security features. This duty is further defined by federal and state guidelines and industry norms, discussed above.

78.    Defendant breached its duties by failing to implement reasonable safeguards to ensure Plaintiff's and Class members' PII was adequately protected.  As a direct and proximate result of this breach of duty, the Data Breach occurred, and Plaintiff and Class members were harmed. Plaintiff and Class members did not consent to having their PII disclosed to any third-party, much less a malicious hacker who would sell it to criminals on the dark web.

79.    The 2021 Data Breach was a reasonably foreseeable consequence of Defendant's inadequate security systems. T-Mobile, which made in excess of $65 billion in revenue in 2020, certainly has the resources to implement reasonable security systems to prevent or limit damage from data breaches. And after almost yearly data breaches for the past 5 years, it knew that its systems were utterly lacking. Even so, it failed to properly invest in its data security.  Had T-Mobile implemented reasonable data security systems and procedures (*i.e.*, followed guidelines from industry experts and state and federal governments), then it likely could have prevented hackers from infiltrating its systems and accessing its customers' PII.

80.    T-Mobile's failure to implement reasonable security systems has caused Plaintiff and Class members to suffer and continue to suffer harm that adversely impact Plaintiff and Class members economically, emotionally, and/or socially. As discussed above, Plaintiff and Class

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

members now face a substantial, imminent, and ongoing threat of identity theft, scams, and resulting harm. These individuals now must spend significant time and money to continuously monitor their accounts and credit scores and diligently sift out phishing communications to limit potential adverse effects of the 2021 Data Breach regardless of whether any Class member ultimately falls victim to identity theft.

81. In sum, Plaintiff and Class members were injured as follows: (i) theft of their PII and the resulting loss of privacy rights in that information; (ii) improper disclosure of their PII; (iii) the lost value of unauthorized access to their PII; (iv) diminution in value of their PII; (v) the certain, imminent, and ongoing threat of fraud and identity theft, including the economic and non-economic impacts that flow therefrom; (vi) ascertainable out-of-pocket expenses and the value of their time allocated to fixing or mitigating the effects of the 2021 Data Breach; (vii) overpayments to T-Mobile for goods and services purchased, as Plaintiff and Class members reasonably believed a portion of the sale price would fund reasonable security measures that would protect their PII, which was not the case; and/or (viii) nominal damages.

82. Even though T-Mobile has decided to offer free credit monitoring for two years to its affected customers, this is insufficient to protect Plaintiff and Class members. As discussed above, the threat of identity theft and fraud from the Data Breach will extend for many years and cost Plaintiff and the Classes significant time and effort.  Although it has not yet notified all individual customers of the breach, T-Mobile's website acknowledges this, encouraging customers to postpaid customers proactively change their PIN and take advantage of Account Takeover Protection capabilities.

83. Plaintiff and Class members therefore have a significant and cognizable interest in obtaining injunctive and equitable relief (in addition to any monetary damages) that protects them from these long-term threats. Accordingly, this action represents the enforcement of an important right affecting the public interest and will confer a significant benefit on the general public or a large class of persons.

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

1

**CLASS ACTION ALLEGATIONS**

2       84.    Plaintiff brings this action on behalf of himself, and all others similarly situated

3  pursuant to Federal Rule of Civil Procedure 23 as representative of the Classes defined as follows:

4              (a)    The Nationwide Class:    All U.S. residents whose data was

5       exfiltrated in the 2021 Data Breach.

6              (b)    The New Jersey Class: All New Jersey residents whose data was

7       exfiltrated in the 2021 Data Breach.

8       85.    Specifically excluded from the Classes are Defendant; its officers, directors, or

9  employees; any entity in which Defendant has a controlling interest; and any affiliate, legal

10 representative, heir, or assign of Defendant.  Also excluded from the Classes are any federal, state,

11 or local governmental entities, any judicial officer presiding over this action and the members of

12 their immediate family and judicial staff, and any juror assigned to this action.

13      86.    **Class Identity**: The members of the Classes are readily identifiable and

14 ascertainable. Defendants and/or their affiliates, among others, possess the information to identify

   and contact class members.

15      87.    **Numerosity**: The members of the Classes are so numerous that joinder of all of

16 them is impracticable.  While the exact number of class members is unknown to Plaintiff at this

17 time, based on information and belief, the Nationwide Class consists of between 50 and 100

18 million customers whose data was compromised in the 2021 Data Breach, and the New Jersey

19 Class consists of millions of customers whose data was compromised in the Data Breach.

20      88.    **Typicality**: Plaintiff's claims are typical of the claims of the members of the classes

21 because all class members had their PII accessed, exfiltrated, and stolen in the 2021 Data Breach

22 and were harmed as a result.

23      89.    **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Classes.

24 Plaintiff has no interest antagonistic to those of the classes and are aligned with Class members'

25

26

CLASS ACTION COMPLAINT - 25

interests because Plaintiff was subject to the same 2021 Data Breach as Class members and faces similar threats due to the 2021 Data Breach as Class members. Plaintiff has also retained competent

90.     counsel with significant experience litigating complex class actions, including Data Breach cases involving multiple classes.

91.     <u>Commonality and Predominance</u>: There are questions of law and fact common to the classes. These common questions predominate over any questions affecting only individual class members. The common questions of law and fact include, without limitation:

(a)     Whether Defendant violated New Jersey Statute Annotated §§ 56:8-163, *et seq.*;

(b)     Whether Defendant violated New Jersey Statute Annotated §§ 56:8-1, *et seq.*;

(c)     Whether Defendant owed Plaintiff and class members a duty to implement and maintain reasonable security procedures and practices to protect their personal information;

(d)      Whether Defendant breached an implied contract with Plaintiff and class members, including but not limited to whether Defendant breached an implied agreement with Plaintiff and class members to keep their PII confidential;

(e)     Whether Defendant received a benefit without proper restitution making it unjust for Defendant to retain the benefit without commensurate compensation;

(f)     Whether Defendant acted negligently in connection with the monitoring and/or protection of Plaintiff's and class members' PII;

(g)     Whether Defendant breached its duty to implement reasonable security systems to protect Plaintiff's and class members' PII;

(h)     Whether Defendant's breach of its duty to implement reasonable security systems directly and/or proximately caused damages to Plaintiff and class members;

(i)     Whether Defendant adequately addressed and fixed the vulnerabilities that enabled the 2021 Data Breach;

CLASS ACTION COMPLAINT - 26

(j)     When Defendant learned of the 2021 Data Breach and whether its response was adequate;

(k)     Whether Plaintiff and other class members are entitled to credit monitoring and other injunctive relief;

(l)     Whether Defendant provided timely notice of the 2021 Data Breach to Plaintiff and class members; and,

(m)     Whether class members are entitled to compensatory damages, punitive damages, and/or statutory or civil penalties as a result of the 2021 Data Breach.

92.     Defendant has engaged in a common course of conduct and class members have been similarly impacted by Defendant's failure to maintain reasonable security procedures and practices to protect customers' PII.

93.     Superiority: A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most if not all class members would find the cost of litigating their individual claims prohibitively high and have no effective remedy. The prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members and risk inconsistent treatment of claims arising from the same set of facts and occurrences.  Plaintiff knows of no difficulty likely to be encountered in the maintenance of this action as a class action under Federal Rule of Civil Procedure 23.

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

## CLAIMS FOR RELIEF

### COUNT I

**Violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1,** *et seq.*
**(On Behalf Of The New Jersey Class)**

94.     Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs.

95.     T-Mobile is a "person" as defined by N.J. Stat. Ann. § 56:8-1(d).

96.     T-Mobile sells "merchandise" as defined by N.J. Stat. Ann.§ 56:8-l(c) & (e).

97.     The New Jersey Consumer Fraud Act, N.J. Stat. §§ 56:8 1, *et seq.*, prohibits unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation, as well as the knowing concealment, suppression, or omission of any material fact with the intent that others rely on the concealment, omission, or fact, in connection with the sale or advertisement of any merchandise.

98.     T-Mobile's unconscionable and deceptive practices include:

(a)     Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff and New Jersey Subclass members' Personal Information, which wasa direct and proximate cause of the 2021 Data Breach;

(b)     Failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the 2021 Data Breach;

(c)     Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and New Jersey Subclass members'

CLASS ACTION COMPLAINT - 28

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the 2021 Data Breach;

(d)     Misrepresenting that it would protect the privacy and confidentiality of Plaintiff and New Jersey Subclass members' Personal Information, including by implementing andmaintaining reasonable security measures;

(e)     Misrepresenting that it would comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and New Jersey Subclass members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45;

(f)     Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff and Subclass members' Personal Information; and

(g)     Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff and New Jersey Subclass members' Personal Information, including duties imposed by the FTC Act, 15 U.S.C. § 45.

99.     T-Mobile's representations and omissions were material because they were likely to deceive reasonable consumers about the adequacy of T-Mobile's data security and ability to protect the confidentiality of consumers'Personal Information.

100.     T-Mobile intended to mislead Plaintiff and New Jersey Subclass members and induce them to rely on its misrepresentations and omissions.

101.     T-Mobile acted intentionally, knowingly, and maliciously to violate New Jersey's Consumer Fraud Act, and recklessly disregarded Plaintiff and New Jersey Subclass members' rights. T-Mobile's past data breaches and breaches within the wireless communications industry put it on notice that its security and privacy protections were inadequate.

102.     As a direct and proximate result of T-Mobile 's unconscionable and deceptive practices, Plaintiff and New Jersey Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

damages, including loss of the benefit of their bargain with T-Mobile as they would not have paid T-Mobile for goods and services or would have paid less for such goods and services but for T-Mobile's violations alleged herein; losses from fraud and identity theft; costs for credit monitoring and identity protection services; time and expenses related to monitoring their financial accounts for fraudulent activity; time and money spent cancelling and replacing passports; loss of value of their Personal Information; and an increased, imminent risk of fraud and identity theft.

103.    Plaintiff and New Jersey Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, other equitable relief, actual damages, treble damages, restitution, and attorneys' fees, filing fees, and costs.

## COUNT II

**Violation of the New Jersey Customer Security Breach Disclosure Act, N.J. Stat. Ann. §§ 56:8-163, *et seq.*
(On Behalf Of The New Jersey Class)**

104.    Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs.

105.    T-Mobile is a business that conducts business in New Jersey under N.J. Stat. Ann. § 56:8-163(a).

106.    Plaintiff and New Jersey Subclass members' Personal Information includes Personal Information covered under N.J. Stat. Ann. §§ 56:8-163, *et seq.*

107.    Under N.J. Stat. Ann. *§* 56:8-163(a), "[a]ny business that conducts business in New Jersey. . . shall disclose any breach of security of [] computerized records following discovery or notification of the breach to any customer who is a resident of New Jersey whose personal information was, or is reasonably believed to have been, accessed by an unauthorized person."

108.    Because T-Mobile discovered a breach of its security system in which Personal Information was, or is reasonably believed to have been, acquired by an unauthorized person

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

andthe Personal Information was not secured, T-Mobile had an obligation to disclose the Data Breachin a timely and accurate fashion as mandated under N.J. Stat. Ann.§§ 56:8-163, et seq.

109.    By failing to disclose the Data Breach in a timely and accurate manner, T-Mobile violated N.J. Stat. Ann. § 56:8-163(a).

110.    As a direct and proximate result of T-Mobile's violations of N.J. Stat. Ann. § 56:8-163(a), Plaintiff and New Jersey Subclass members suffered the damages described above.

111.    Plaintiff and New Jersey Subclass members seek relief under N.J. Stat. Ann. § 56:8-19, including treble damages, attorneys' fees and costs, and injunctive relief.

## COUNT III

### Negligence
### (On Behalf Of The Nationwide Class Or Alternatively The New Jersey Subclass)

112.    Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs.

113.    Defendant owed Plaintiff and Class members a duty to exercise reasonable care in protecting their PII from unauthorized disclosure or access. Defendant breached its duty of care by failing to implement reasonable security procedures and practices to protect this PII. Among other things, Defendant failed to: (i) implement security systems and practices consistent with federal and state guidelines; (ii) implement security systems and practices consistent with industry norms; (iii) timely detect the 2021 Data Breach; and (iv) timely disclose the 2021 Data Breach to impacted customers.

114.    Defendant knew or should have known that Plaintiff's and Class members' PII was highly sought after by cyber criminals and that Plaintiff and class members would suffer significant harm if their PII was stolen by hackers.

115.    Defendant also knew or should have known that timely detection and disclosure of the 2021 Data Breach was required and necessary to allow Plaintiff and class members to take appropriate actions to mitigate the resulting harm. These efforts include, but are not limited to, freezing accounts, changing passwords, monitoring credit scores/profiles for fraudulent charges,

CLASS ACTION COMPLAINT - 31

contacting financial institutions, and cancelling or monitoring government-issued IDs such as passports and driver's licenses.

116.    Defendant had a special relationship with Plaintiff and Class members who entrusted Defendant with several pieces of PII. Defendant's customers were required to provide PII when purchasing or attempting to purchase Defendant's products and services Plaintiff and class members were led to believe Defendant would take reasonable precautions to protect their PII and would timely inform them if their PII was compromised, which Defendant failed to do.

117.    The harm that Plaintiff and Class members suffered (and continue to suffer) was the reasonably foreseeable product of Defendant's breach of its duty of care. Defendant failed to enact reasonable security procedures and practices, and Plaintiff and class members were the foreseeable victims of data theft that exploited the inadequate security measures. The PII accessed in the 2021 Data Breach is precisely the type of information that cyber criminals seek and use to commit cyber-crimes.

118.    But-for Defendant's breach of its duty of care, the 2021 Data Breach would not have occurred and Plaintiff's and class members' PII would not have been stolen and offered for sale by an unauthorized and malicious party.

119.    As a direct and proximate result of the Defendant's negligence, Plaintiff and class members have been injured and are entitled to damages in an amount to be proven at trial.  Such damages include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the 2021 Data Breach reviewing bank statements, credit card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of their

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

PII; lost value of unauthorized access to their PII; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

## COUNT IV

### Negligence *Per Se*
#### (On Behalf Of The Nationwide Class Or Alternatively The New Jersey Subclass)

120.    Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs.

121.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendant of failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duty.

122.    Defendant violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect PII and not complying with industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

123.    Defendant's violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence per se.

124.    Class members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) were intended to protect.

125.    Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and class members.

126.    As a direct and proximate result of the Defendant's negligence, Plaintiff and class members have been injured and are entitled to damages in an amount to be proven at trial. Such damages include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss

CLASS ACTION COMPLAINT - 33

of the value of their privacy and the confidentiality of their stolen PII; lost value of unauthorized access to their PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach reviewing bank statements, credit card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

**COUNT V**

**Unjust Enrichment**
**(On Behalf Of The Nationwide Class Or Alternatively The New Jersey Subclass)**

127.    Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs.

128.    Plaintiff and class members have an interest, both equitable and legal, in the PII about them that was conferred upon, collected by, and maintained by Defendant and that was ultimately stolen in the 2021 Data Breach.

129.    Defendant was benefitted by the conferral upon it of the PII pertaining to Plaintiff and class members and by its ability to retain, use, and profit from that information.  Defendant understood that it was in fact so benefitted.

130.    Defendant also understood and appreciated that the PII pertaining to Plaintiff and class members was private and confidential and its value depended upon Defendant maintaining the privacy and confidentiality of that PII.

131.    But for Defendant's willingness and commitment to maintain its privacy and confidentiality, that PII would not have been transferred to and entrusted with Defendant.

132.    Defendant continues to benefit and profit from its retention and use of the PII while its value to Plaintiff and class members has been diminished.

133.    Defendant also benefitted through its unjust conduct by selling its services for more than those services were worth to Plaintiff and class members, who would not have applied for or

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

used T-Mobile service plans at all, or at the terms offered by T-Mobile, had they been aware that Defendant would fail to protect their PII.

134.    Defendant also benefitted through its unjust conduct by retaining money that it should have used to provide reasonable and adequate data security to protect Plaintiff's and class members' PII.

135.    It is inequitable for Defendant to retain these benefits.

136.    As a result of Defendant's wrongful conduct as alleged in this Complaint (including, among things, its knowing failure to employ adequate data security measures, its continued maintenance and use of the PII belonging to Plaintiff and class members without having adequate data security measures, and their other conduct facilitating the theft of that PII), Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and class members.

137.    Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein, including the compiling and use of Plaintiff's and class members' PII, while at the same time failing to maintain that information secure from intrusion and theft by hackers and identity thieves.

138.    Under the common law doctrine of unjust enrichment, it is inequitable for Defendant to be permitted to retain the benefits it received, and is still receiving, without justification, from Plaintiff and class members in an unfair and unconscionable manner. Defendant's retention of such benefits under circumstances making it inequitable to do so constitutes unjust enrichment.

139.    The benefits conferred upon, received, and enjoyed by Defendant was not conferred officiously or gratuitously, and it would be inequitable and unjust for Defendant to retain these benefits.

140.    Plaintiff has no adequate remedy at law.

141.    Defendant is therefore liable to Plaintiff and class members for restitution or disgorgement in the amount of the benefit conferred on Defendant as a result of its wrongful conduct, including specifically: the value to Defendant of the PII that was stolen in the 2021 Data

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

Breach; the profits Defendant is receiving from the use of that information; the amounts that T-Mobile overcharged Plaintiff and class members for use of its services; and the amounts that Defendant should have spent to provide reasonable and adequate data security to protect Plaintiff's and class members' PII.

<strong>COUNT VI</strong>

<strong>Breach of Implied Contract</strong><br><strong><u>(On Behalf Of The Nationwide Class Or Alternatively The New Jersey Subclass)</u></strong>

142.     Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs.

143.     Plaintiff and class members entered into an implied contract with T-Mobile when they sought or obtained services from T-Mobile, or otherwise provided PII to T-Mobile.

144.     As part of these transactions, T-Mobile agreed to safeguard and protect the PII of Plaintiff and class members, and in the alternative, nominal damages.

145.     Plaintiff and class members entered into implied contracts with the reasonable expectation that T-Mobile's data security practices and policies were reasonable and consistent with industry standards. Plaintiff and class members believed that T-Mobile would use part of the monies paid to T-Mobile under the implied contracts to fund adequate and reasonable data security practices.

146.     Plaintiff and class members would not have provided and entrusted their PII to T-Mobile or would have paid less for T-Mobile's services in the absence of the implied contract or implied terms between them and T-Mobile. The safeguarding of the PII of Plaintiff and class members was critical to realize the intent of the parties.

147.     Plaintiff and class members fully performed their obligations under the implied contracts with T-Mobile.

148.     T-Mobile breached its implied contracts with Plaintiff and class members to protect their PII when it (1) failed to have security protocols and measures in place to protect that information; and (2) disclosed that information to unauthorized third parties.

149.     As a direct and proximate result of T-Mobile's breach of implied contract, Plaintiff and class members sustained actual losses and damages as described in detail above, including that

CLASS ACTION COMPLAINT - 36

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

they did not get the benefit of the bargain for which they paid and were overcharged by T-Mobile for its services.

## COUNT VII

### Breach of Confidence
### (On Behalf Of The Nationwide Class Or Alternatively The New Jersey Subclass)

150.    Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs.

151.    At all times during Plaintiff's and class members' interactions with T-Mobile, T-Mobile was fully aware of the confidential and sensitive nature of Plaintiff's and class members' PII.

152.    T-Mobile's relationship with Plaintiff and class members was governed by terms and expectations that Plaintiff's and class members' protected PII would be collected, stored, and protected in confidence, and would not be disclosed to the public or any unauthorized third parties.

153.    Plaintiff and class members provided their respective PII to T-Mobile with the explicit and implicit understandings that T-Mobile would protect and not permit the PII to be disseminated to the public or any unauthorized parties.

154.    Plaintiff and class members also provided their respective PII to T-Mobile with the explicit and implicit understandings that T-Mobile would take precautions to protect the PII from unauthorized disclosure, such as following basic principles of encryption and information security practices.

155.    T-Mobile voluntarily received in confidence Plaintiff's and class members' PII with the understanding that PII would not be disclosed or disseminated to the public or any unauthorized third parties.

156.    Due to T-Mobile's failure to prevent, detect, avoid the 2021 Data Breach from occurring by following best information security practices to secure Plaintiff's and class members' PII, Plaintiff's and class members' PII was disclosed and misappropriated to the public and

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

unauthorized third parties beyond Plaintiff's and class members' confidence, and without their express permission.

157.    But for T-Mobile's disclosure of Plaintiff's and class members' PII in violation of the parties' understanding of confidence, their PII would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. The 2021 Data Breach was the direct and legal cause of the theft of Plaintiff's and class members' PII, as well as the resulting damages.

158.    The injury and harm Plaintiff and class members suffered was the reasonably foreseeable result of T-Mobile's unauthorized disclosure of Plaintiff's and class members' PII. T-Mobile knew its computer systems and technologies for accepting, securing, and storing Plaintiff's and class members' PII had serious security vulnerabilities because T-Mobile failed to observe even basic information security practices or correct known security vulnerabilities.

159.    As a direct and proximate result of T-Mobile's breaches of confidence, Plaintiff and class members have been injured and are entitled to damages in an amount to be proven at trial. Such damages include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the 2021 Data Breach reviewing bank statements, credit card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of their PII; lost value of unauthorized access to their PII; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

BADGLEY MULLINS TURNER PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

# COUNT VIII

## Declaratory Judgment
## (On Behalf Of The Nationwide Class)

160.    Plaintiff repeats and realleges every allegation set forth in the preceding paragraphs.

161.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., the Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

162.    An actual controversy has arisen in the wake of the 2021 Data Breach regarding its present and prospective common law and other duties to reasonably safeguard its customers' PII and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and class members from further data breaches that compromise their PII. Plaintiff remains at imminent risk that further compromises of their PII will occur in the future.

163.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

(a)    Defendant continues to owe a legal duty to secure consumers' PII and to timely notify consumers of a data breach under the common law, Section 5 of the FTC Act, and various state statutes.

(b)    Defendant continues to breach this legal duty by failing to employ reasonable measures to secure consumers' PII.

164.    The Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security practices consistent with law and industry standards to protect consumers' PII.

165.    If an injunction is not issued, Plaintiff and class members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at T-Mobile. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiff and class members will not have an adequate remedy at law because many of the resulting injuries

CLASS ACTION COMPLAINT - 39

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
TEL 206.621.6566
FAX 206.621.9686

are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

166.    The hardship to Plaintiff and class members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another massive data breach occurs at T-Mobile, Plaintiff and class members will likely be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

167.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at T-Mobile, thus eliminating the additional injuries that would result to Plaintiff and the millions of consumers whose PII would be further compromised.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands a trial by jury and hereby respectfully request:

(a)    That the Court determine that Plaintiff's claims are suitable for class treatment and certify the proposed Class pursuant to Fed. R. Civ. P. 23;

(b)    That the Court appoint Plaintiff as representatives of the Classes;

(c)    That Plaintiff's counsel be appointed as counsel for the Classes;

(d)    That the Court award compensatory damages, punitive damages, statutory and civil penalties to Plaintiff and the Classes as warranted by applicable law;

(e)    In the alternative, that the Court award nominal damages as permitted by law;

(f)    That the Court award injunctive or other equitable relief that directs Defendant to provide Plaintiff and the Classes with free credit monitoring and identity theft protection, and to implement reasonable security procedures and practices to protect customers' PII that conform to relevant federal and state guidelines and industry norms;

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686

(g)    That the Court award declaratory judgment in favor of Plaintiff determining that Defendant's failure to implement reasonable security measures gives rise to a claim under the CCPA;

(h)    That the Court award reasonable costs and expenses incurred in prosecuting this action, including attorneys' fees and expert fees pursuant to Cal. Code Civ. P. § 1021.5; and

(i)    Such other relief as the Court may deem just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demand a trial by jury of all issues properly triable to a jury in this case.


DATED: August 26, 2021


**BADGLEY MULLINS TURNER PLLC**


By: */s/Duncan C. Turner*
    Duncan C. Turner, WSBA No. 20597
19929 Ballinger Way NE, Suite #200
Seattle, WA 98155
Telephone: (206) 621-6566
Email:  dturner@badgleymullins.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna (*Pro Hac Vice forthcoming*)
Gregory M. Egleston (*Pro Hac Vice forthcoming*)
501 Fifth Avenue, 19th Floor
New York, NY 10017
Email: tjmkenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***

**BADGLEY MULLINS TURNER** PLLC
19929 Ballinger Way NE, Suite 200
Seattle, WA 98155
**TEL** 206.621.6566
**FAX** 206.621.9686